



AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| United States of America | ) |
| v. | ) |
| FRITZ KRAMER, | ) Case No. |
| | ) |
| | ) |
| _____ | ) |
| Defendant(s) | ) |

**FILED**

JUL 06 2016

CLERK SUSAN Y. SOONG
NORTHERN U.S. DISTRICT COURT
DISTRICT OF CALIFORNIA
SAN JOSE

Case No. **16  70836 MAG**
Under Seal

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___December 2008--present date___ in the county of ___Santa Clara___ in the

___Northern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Count One:18 U.S.C. Section 1343 | Wire Fraud |
| Count Two:18 U.S.C. Section 1348 | Commodities Fraud |
| | PENALTIES: |
| | 18 U.S.C. Section 1343: 20 years imprisonment, $250,000 fine, up to three years supervised release, $100 special assessment fee |
| | 18 U.S.C. Section 1348: 25 years imprisonment, $250,000 fine, up to three years supervised release |

This criminal complaint is based on these facts:

Please see attached affidavit.
NO BAIL ARREST WARRANT REQUESTED

Approved as to form:  Jeff Nedrow, AUSA _____

UNDER SEAL

☑ Continued on the attached sheet.

_____
*Complainant's signature*

FBI Special Agent Mark Matulich
*Printed name and title*

Sworn to before me and signed in my presence.

No bail arrest warrant authorized.

Date: ___7/6/2016  9:45 a.m___

_____
*Judge's signature*

City and state: ___San Jose, CA___         Hon. Nathanael Cousins, U.S. Magistrate Judge
*Printed name and title*

## COMPLAINT PRESENTED IN SUPPORT FOR AN ARREST WARRANT

I, Mark R. Matulich, a Special Agent of the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      This complaint is presented in support of an application for an arrest warrant for Fritz Kramer ("Kramer").

2.      As set forth herein, there is probable cause to believe that Kramer has engaged in an ongoing scheme to defraud individuals residing in the Northern District of California and elsewhere pursuant to an ongoing investment fraud scheme in violation of Title 18, United States Code, Section 1343, Wire Fraud and Title 18, United States Code, Section 1348, Commodities Fraud.

3.      The contents of this affidavit are based upon my personal knowledge, information provided to me by Special Agents and other employees of the FBI, and percipient witnesses, as well as my experience and background as a Special Agent of the FBI. Since this affidavit is being submitted for the limited purpose of securing a warrant and order, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that violations of United States laws occurred.

4.      I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

5.      I am a Special Agent with the FBI, and have been so employed since July 2010.  I

1

was previously assigned to the San Francisco Division, Oakland Resident Agency where I was responsible for conducting investigations of a variety of domestic terrorism matters to include violations of weapons and explosives charges, white collar crime offenses, threats to federal officials, and fugitive recovery.  Since October 2014, I have been assigned to the San Francisco Division, San Jose Resident Agency where I am assigned to investigate complex financial crimes, including bankruptcy fraud, investment fraud, mortgage fraud, commodities fraud, money laundering, and corporate fraud.

6.      I have training in sophisticated investigative techniques, the operation and handling of FBI informants, and interviewing subjects and witnesses involved in the offenses described herein.   I have become knowledgeable in regard to the methods and modes utilized by persons who are engaging in a wide variety of criminal activity that constitutes violations of federal laws. My training and experience includes the preparation and execution of arrest and search warrants.

## APPLICABLE LAW

7.      18 U.S.C. § 1343 (Wire Fraud) states, in part, that whoever having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

8.      18 U.S.C. § 1348 (Securities and Commodities Fraud) states, in part, that whoever knowingly executes, or attempts to execute, a scheme or artifice – (1) to defraud any person in connection with any commodity for future delivery, or any option on a commodity for future

delivery, or any security of an issue with a class of securities registered under section 12 of the

Securities Exchange Act of 1934 (15 U.S.C. 781) or that is required to file reports under section

15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 780 (d)); or (2) to obtain, by means of

false or fraudulent pretenses, representations, or promises, any money or property in connection

with the purchase or sale of any commodity for future delivery, or any option on a commodity

for future delivery, or any security of an issue with a class of securities registered under section

12 of the Securities Exchange Act of 1934 (15 U.S.C. 781) or that is required to file reports

under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 780 (d)); shall be fined

under this title, or imprisoned not more than 25 years, or both.

## OVERVIEW OF SCHEME TO DEFRAUD

9.       Beginning in approximately December 2008, Kramer began contacting investors

through e-mail and telephone regarding an investment opportunity in an African gold and

diamond direct-export project. Several of the prospective investors contacted by Kramer resided

in Santa Clara County and elsewhere in the Northern District of California, and many of the

investors were elderly. Kramer holds a current Swiss passport and an expired United States

passport, and appears to be operating the scheme from outside the United States. In e-mails to

investors, Kramer described the investment opportunity as a philanthropic endeavor whereby

investment monies would be used to fund a direct export channel for gold and diamonds from

mines in Africa. One feature of the proposed project was to have the gold and diamonds

exported directly in an effort to cut out corrupt middle men. Kramer claimed that by cutting out

the middle men, poverty-stricken African miners would reap higher profits from their labor in

the mines, and investors would earn a higher return on their investment. Kramer claimed that

investors could earn up to 10 times their investment. Kramer characterized the export project as

3

a short-term investment; however, over the years, Kramer also repeatedly told investors that unexpected events had arisen that required the ongoing investment of investor funds to realize a return on the investment. Over the years, Kramer cited, at one time or another, the following reasons for delays and the need for additional money from investors as a prerequisite to the success of the export project: (1) the need to pay for multiple surgeries for Mukeune, the mining engineer central to the project, including brain and liver surgeries; (2) the loss of $80,000 in investor cash which was incinerated in a car accident; (3) a lawyer's role in seizing $95,000 cash in order to address Kramer's unpaid legal bills; (4) the need to bribe corrupt government officials in Africa; (5) the need to renew expired documents and certifications; (6) the need to pay for insurance; (7) the need to pay additional storage and shipping costs; (8) additional loan payments; and (9) taxes.

10.     Kramer has solicited funds from investors using telephone, Skype, and e-mail, often employing high-pressure tactics to keep the investors investing more and more money. Kramer also has pushed investors to pressure each other or to recruit friends and family for additional investments in the project. To date, the investigation has identified approximately 40 investors as victims of the scheme, several of whom reside in the Santa Clara County area and elsewhere in the Northern District of California. Many of the victims are elderly. According to information provided by victim investors, as many as 40 victims have reportedly invested a total of approximately $11 million in Kramer's project. None of the victims, to date, have received a return on their investment in the project.

11.     Another individual who sent e-mails as a part of the scheme identified himself as Jean Paul Mukeune, and alternatively as Jean Paul Mukendi. Mukeune claimed to be a mining engineer associated with the project. Investors corresponded with a male claiming to be

4

Mukeune via telephone and e-mail. Mukeune used the e-mail address of mukendijp@outlook.com. Mukeune spoke broken English, and stated that French was his primary language. Mukeune also raised money from investors for or related to the project. Mukeune e-mailed investors thanking them for their financial support of the project. Kramer and Mukeune both sent e-mails indicating that Mukeune suffered from a variety of serious health conditions, and requesting that investors send money to assist in the payment of Mukeune's medical bills.

12.     Throughout the course of the scheme, Kramer has provided investors with a variety of documents, many of which he represented as official correspondence he received from government agencies, organizations and private companies in Africa and elsewhere. These documents appear to have been used to reassure investors that the gold and diamond export opportunity was legitimate, and to provide a basis for Kramer's ongoing requests for additional investments in the program.

13.     In September 2015, Kramer sent e-mails from f.kramer80439@gmail.com to an FBI agent acting in an undercover capacity in the role of a potential investor ("UCE-1"). One of these e-mails contained a document referred to as "Manifest Raw Diamonds – First Page" and "Manifest Raw Diamonds – Last Page." Another of these e-mails contained a document referred to as "Invoice." Kramer presented these documents to UCE-1 as proof that the gold and diamonds underlying the project were real, and that the investment was legitimate. Kramer used these documents as part of his efforts to solicit funds from UCE-1 for the project.

14.     On February 2, 2016, the General Secretary, Ministry of Mines for the Democratic Republic of Congo ("DRC"), identified as General Secretary Kasanda, reviewed 10 documents Kramer provided to investors as part of his efforts to convince people to invest in the

project. Two of these documents were the "Manifest Raw Diamonds – First and Last Page" and "Invoice" which were e-mailed to UCE-1, as described in the preceding paragraph. The General Secretary is familiar with documents used in the mining industry in the DRC. The General Secretary stated that the documents were fake documents.

15.      In his communications with investors, Kramer referenced "Kimberley" certificates and the Kimberley certification process as a way to lend credibility to the project. The Kimberley certification process is the procedure within the diamond industry established to prevent "conflict diamonds" from entering the mainstream rough diamond market. Kramer repeatedly misspelled Kimberley as "Kimberly" when referencing this process in e-mail correspondence with investors. A purported Kimberley certificate associated with Kramer's project also incorrectly spelled the word Kimberley as "Kimberly." An investor provided the FBI with a copy of a Kimberley certificate sent by Kramer from the e-mail account of f.kramer80439@gmail.com on August 25, 2011. A U.S. Government employee familiar with the Kimberley process and Kimberley certificates reviewed Kramer's "Kimberly" certificate, and determined that it appeared to be fake. The employee's determination that the Kramer-provided certificate was based upon the misspelling of the word Kimberley and a side-by-side comparison of Kramer's certificate to a known, legitimate DRC Kimberley certificate.

16.      Kramer claimed he had control over three primary shipments of gold and diamonds, and referred to these shipments, respectively, as "Big One," "30kg," and "25kg." The "Big One" allegedly consisted of 688kg of gold. Kramer also claimed he had control of over 47,000 karats of diamonds.

17.      Kramer claimed Mukeune, the mining engineer, was vital to the project, and requested money from investors to fund medical procedures for Mukeune, including brain

surgery and liver/gastrointestinal surgery. Kramer claimed the shipments of gold and diamonds underlying the investments could be lost without Mukeune.

18.     Kramer pressured investors to recruit their family and friends to invest in the project. Kramer encouraged investors to pool money in certain other investors' accounts who would then transfer the funds as instructed by Kramer. Kramer instructed investors to send money via Western Union and MoneyGram, and to split transactions into dollar amounts that would avoid transaction reporting requirements.

19.     To date, according to Kramer, all of the shipments of gold and diamonds that the project is predicated upon are still held up in various locations for various reasons. Kramer continues to actively solicit investors via telephone, Skype and e-mail for funds related to his project, and has requested additional funds from investors as recently as July 2016.

## EXCERPTS FROM E-MAILS BETWEEN TARGET E-MAIL ACCOUNTS AND INVESTORS[1]

20.     Kramer has primarily used the e-mail account of f.kramer80439@gmail.com to send e-mails to investors in connection with the scheme. However, as noted below, on occasion Kramer has also used the e-mail accounts identified by the e-mail addresses of jiffydoo@gmail.com and remark1000@gmail.com to e-mail investors. The scheme participant identifying himself as Jean Paul Mukeune has primarily used the e-mail account of mukendijp@outlook.com to e-mail investors. Pertinent excerpts of e-mails from all four target accounts to investors are highlighted in the following paragraphs.

21.     On June 6, 2014, a person identifying himself as Kramer sent an e-mail from the jiffydoo@gmail.com account to an investor in which he wrote: "Insurance for the 25kg is

---

[1] Typos and misspellings were not corrected from the actual e-mails cited.

$15,000, covering the minimum period available: 3 months has been issued now in Congo. The mine has already paid its contribution of $5000. As soon as we pay the difference of $10,000, we can fly. As you will understand, there is tremendous urgency to fly this shipment out, as we have run out of time for payment towards the Big One." Subsequently, in the same e-mail, the e-mail stated: "Please let me urge you to participate in the payment of the policy. DUE TO THE URGENCY, PLEASE LET ME PRESENT THIS ADDITIONAL INCENTIVE: for any $1000 that you can help with by tomorrow Saturday, you will get a fur-fold amount directly out of the sales of the 25kg, i.e., within 10 days of arrival. Please send your insurance money directly to Dennis Wong so that he may send out the money tomorrow Saturday evening, so that we have a chance to fly the 25kg on Monday. Thank you. Fritz"

22.     On August 12, 2014, a person identifying himself as Kramer sent an e-mail from the jiffydoo@gmail.com account to an investor in which he wrote: "the 30kg are with customs in Lusaka, ready to be shipped to Zurich, Switzerland. Insurance has been purchased, and all documents in place EXCEPT for the new Metals Certificate which has a cost of $4000. Chisebu Rodgers is trying to come up with $1000 towards this amount, leaving $3000 to be paid. Because we did not have $4000 in cash, we could not put the 30kg on the flight today. However, the next available direct flight to Europe is on Thursday. The fact that we did not count on the need for this is now creating immense pressure, because we need cash from the sale of the 30kg with greatest urgency."

23.     On September 24, 2014, a person identifying himself as Kramer sent an e-mail from the remark1000@gmail.com account to an investor in which he wrote: "You mentioned that the "old" contact/friend does not want to speak with me, yet that I should speak with him? And I understood you saying that he would not have confidence an Airr Waybill. So if he is not

available, is that it? Or did I miss something? Did you also refer to him when saying that "he" is not reachable until Thursday? I guess we would need to have $15000 to end Thursday, tomorrow (at least that is what JP reinforced with me today)."

24.    On December 18, 2014, a person identifying himself as Kramer sent an e-mail from the jiffydoo@gmail.com account to an investor in which he wrote: "The insurance, the two shipping agencies involved, customs in Hong Kong, and of course customs in Malta, AND custms in Switzerland are now in communicatin with us at a furius pace. We have but hours to produce prf of tax payment in Zimbabwe. (We do not have the money, and even if we had it, it would be impossible to have it in Zimbabwe within the same day ---- money has to be paid in cash).

25.    On December 19, 2014, a person identifying himself as Kramer sent an e-mail from the jiffydoo@gmail.com account to an investor in which he wrote: "The 30kg have a wild past: been to Zambia (4 times), South Africa (thre times), Tanzania (2 times), Ethiopia – been stolen and returned two times, detained at border crossings innumerable times.. and that is just the start, having been under the care of five shipping agents. To make it clear once more: Zimbabwe, where the bars were made and where the export documentation was issued, has a pending tax bill of $48,000. This bill has never been paid, and we verified this with the ministry, including the minister himself. It is the sta dard, uniform tax that is being levied. There is zero corruption involved, and I wouldn't even think about trying to influence things there. We need to pay that tax bill."

26.    On December 19, 2014, a person identifying himself as Kramer sent an e-mail from the jiffydoo@gmail.com to an investor in which he wrote: "The Zimbabwean minerals tax of $48,000 has not been paid. Unfortunately, the agent in charge at the time when the tax was

9

levied did not inform us of it. Now that apparently he says he paid for it and has the receipt, I have spoken personally and directly with the Minister, and he confirms that the payment of this tax is pending, and that non-payment of this tax now will result in the Ministry's recalling the 30kg to Zimbabwe where it will be auctioned off."

27.     On April 7, 2015, a person identifying himself as Kramer sent an e-mail from the f.kramer80439@gmail.com account to an investor in which he wrote: "Jean Paul: Has not fully recovered; has had a relapse, re-entered the hospital for a very short time, but is out now on his own because of lack of resources for hospital care. Big One: We barely survived the deadline late last week through a transaction that gives us life until Friday this week. The very minimum that is needed is $35,000 – however a much bigger amount is needed to be out of the woods."

28.     On May 1, 2015, a person identifying himself as Mukeune sent an e-mail from the mukendijp@outlook.com account to an investor in which he wrote: "Thanks for helping me with money for surgeries may GOD bless you and reward for jobs done..."

29.     On July 23, 2015, a person identifying himself as Kramer sent an e-mail from the f.kramer80439@gmail.com account to an investor in which he wrote: "Some 12 hours ago you received notification regarding the 30kg and 25kg parcels that we are about to lose if we cannot get $13,500 together so that the goods can be delivered to us. Of course we are all tired and exhausted, frustrated and broke – and yet, in the face of delays in the shipping of the 30 and 25kg, and major announced investment still not available (see below), we have got to somehow come up with $13,500 by tomorrow Monday so that we can have in hands the proceeds from the sale of this gold, i.e. $2.0Million. The alternative? = Lose it all."

30.     On August 25, 2015, a person identifying himself as Kramer sent an e-mail from the f.kramer80439@gmail.com account to an investor which contained as an attachment an

agreement between the investor and Kramer certifying that in exchange for a short term investment of $15,000 the investor would "be paid $150,000, to be paid out of the proceeds from the monetization of the BigShipment. This payment shall be made within 14 days of the arrival of the Shipment at its destination, and in any case must have been made not later than 21 September 2015."

31.     On August 26, 2015, a person identifying himself as Kramer sent an e-mail from the f.kramer80439@gmail.com account to an investor in which he wrote: "The deadline passed at 1700 hours Wednesday our time. I asked for an extension to this morning. The lumberman will fly to China in a short while. We worked with all our sources until 1700 hours yesterday and we ended up with 85000 Dollars, and needed 15000 to go. So now the other sources are depleted. That means that within one hour I need to confirm to the lumberman that we will have the 15000 dollars on Thursday, and send by Thursday evening. It the must be in the affirmative...that is, it cannot be that I see we will try. ........I very much hope that you can tell me now to go ahead and confirm for Thursday. And we WILL fly....guaranteed."

32.     On August 27, 2015, a person identifying himself as Kramer sent an e-mail from the f.kramer80439@gmail.com account to an investor in which he wrote: "An extension is not possible. The lumberman will travel within hours. It is really now or never regarding the 50,000 from him. Look, if you are rather sure that you can do it then we need to go forward and say yes.....way too much is at stake!!! Now, if it is so that the money can only be sent on Friday because of the time factor, then I can defend that."

33.     On August 28, 2015, a person identifying himself as Kramer sent an e-mail from the f.kramer80439@gmail.com account to an investor in which he wrote: "Below I will show

again the banking coordinates. Will you do the transfer directly with your bank, or will you work with/through Dennis/Jackie? Here the banking information:

> Mzaking International Transport Ltd
>
> Millenium Business Park, Morogoro Road
>
> Dar Es Salaam, Tanzania
>
> Beneficiary Account: 56030030000618
>
> United Bank for Africa (Tanzania) Limited
>
> Further Reference Information: 'Payment for the supply/transport of diesel fuel'"

34.      On September 18, 2015, a person identifying himself as Kramer sent an e-mail from the f.kramer80439@gmail.com account to an investor in which he wrote: "I am sending this to two parties in California and one in Colorado with an urgent request: As all three of you know from my communication in the past hours and days, we need to pay off a loan from the Treasury that was given us to help pay the tax balance. With the help of other investors we have been able to pay back $16,000 so far (already paid back), but still lack exactly $7,500. We must pay in full by tomorrow noon, or our goods will again come under the control of the Government. I ask you do the utomost you can, PLEASE, and come up with $2500 (or as much as you possibly can if less than $2500). So much depends on it. Please try."

35.      On December 20, 2015, a person identifying himself as Kramer sent an e-mail from the jiffydoo@gmail.com account to an investor in which he wrote: "…it so happens that if all goes according to plan, we should be in a position to sell some goods from a small shipment in the immediate future, i.e., hopefully before Christmas! It is not totally certain yet, but please rest assured that if it comes about now, I will endeavor to send you some good money as part of the very first cash flow."

36.     On May 6, 2016, a person identifying himself as Kramer sent an e-mail from the
f.kramer80439@gmail.com account to an investor in which he wrote: "Please see if you can send
5000 dollars! We do have 2000 dollars in hand in Congo....but the operation costs 7000 dollars.
I stand behind every word I said. And you will have 50,000 on 27 May. After all, I have control
over that, completely. The sale is done. And the bank is solid." Later in the same e-mail, the e-
mail stated, "This is the shipment of 30kg. (The other one is 25kg plus 700cf diamonds and that
one is still in Johannesburg. Jean Paul is in the hospital, practically dying. He needs two
operations to safe his life (liver & some other gastroenterolodgy problem). He must have the
operation latest tomorrow morning, or he will be sent out of the hospital." Still later in the same
e-mail, the e-mail stated: "The sale is real, and yes, I sure have participated in all aspects leading
up to the sale. And we did it together, the head of the cargo/logistics company there, and I, and
their lawyer. I can confirm that the sale is real and done, and we are expecting payment at end of
month. I cannot send a copy of the contract for strictly confidentiality reasons. But it is real
alright."

37.     On May 6, 2016, the person identifying himself as Mukeune sent an e-mail from
the mukendijp@outlook.com account to an investor in which he wrote: "Afternoon brother I'm
losing hope now here tomorrow I going out of hospital. The director of this hospital told me if I
don't have money to pay even half. I can go to government hospital were is even worse, people
the the don't have money my girl friend in Lubumbashi she want to borrow the ticket to
Lubumbashi so I can fly there and is near my ancestors village were I go peacefully, than here
diying like a dog. Best regards JP"

38.     On May 6, 2016, the person identifying himself as Kramer sent an e-mail from the
f.kramer80439@gmail.com account in which he provided an investor with the bank account

information of another investor (Cheryl Spetrino, hereinafter "Spetrino") with the following instructions: "The best solution under the condition is that you please deposit in cash the $5000 Cheryl Spetrino account EARLY SATURDAY MORNING." Bank account information for Spetrino's Wells Fargo Bank account was provided. The e-mail continued with: "Please do it as early in the morning as possible, and Cheryl will send the money by about 11 am by MoneyGram." Spetrino and "mukendijp" were listed on the "cc" line of this e-mail.

39.     On May 7, 2016, a person identifying himself as Kramer sent an e-mail from the f.kramer80439@gmail.com account to an investor which provided the following banking information to an investor for the investor to wire transfer funds to pay for Mukeune's hospital bill:

> Mzaking International Transport Ltd
>
> Millenium Business Park, Morogoro Road
>
> Dar Es Salaam, Tanzania
>
> Beneficiary Account: 56030030000618
>
> United Bank for Africa (Tanzania) Limited
>
> Bank ID: UNAFTZT
>
> "Further Reference Information: 'Payment for transportation services'"

40.     On May 7, 2016, a person identifying himself as Kramer sent an e-mail from the f.kramer80439@gmail.com account to an investor which provided the following information regarding MoneyGram to investors for investors to send money to pay for Mukeune's hospital bill ("mukendijp" was listed on the "cc" line of this e-mail): "It is precisely for these emergencies that MoneyGram can be of such great help. Short of sending the money by MoneyGram now, really now, we cannot see any solution, and would face the ultimate

consequences for Jean Paul. The situation is truly urgent, and every hour counts. Truly. And I can truly state that the life of Jean Paul is in your hands at this moment! That is a very hard fact. About MoneyGram: MoneyGram has become very reasonable and they have changed a lot: those that were once barred from MoneyGram are fully reinstated and have no problems whatsoever, especially if the individual transfers are kept below $2000." Subsequently in the same e-mail, the writer stated: "Under the urgent, truly urgent circumstance that we are living at this moment, may I please suggest that you, yourself, send three MoneyGrams as follows, whereby you are the sender, and three employees of Samaila in Tanzania are the receivers, as follows:

> BAHATI LIMU NTANDU (Tanzania): $1,700.00
>
> SOPHIA S. JOSEPH (Tanzania): $1,700.00
>
> BIBIANA M. TARIMO (Tanzania): $1,600.00

**Please send me the Reference Numbers the very minute that you have them. We are going to make work! We shall be ok!"**

41.     Kramer e-mailed investors on May 23, 2016, stating Mukeune had to flee a hospital in the DRC for not paying his hospital bill for a surgery related to his liver and a gastrointestinal issue. Kramer, using the e-mail account of f.kramer80439@gmail.com asked investors for money to pay Mukeune's hospital bill, indicating that the "big shipment" of gold and diamonds the investors were counting on to get their money back would be abandoned unless the investors provided additional payments.

42.     Kramer's May 23, 2016 e-mail to investors from the e-mail account of f.kramer80439@gmail.com specifically stated, in part: "No, nothing at all. Jean is now preparing to flee the area and the big shipment. We have to abandon it. While he is already on

the way out and away, there is one small glimmer of hope: he let it be known that he was going

away to collect $5,600 and have it in with them by tomorrow at 10am. But that is not going to

happen, because we don't see any source at all at this time. If you can do anything, I mean

anything now, we might be able to rescue something. But we are practically lost at this time

already. See what and if you can possibly do today."

43.     The same e-mail account, f.kramer80439@gmail.com, had been previously used

on May 6, 2016 to forward investors an e-mail from mukendijp@outlook.com, which had also

been sent on May 6, 2016. The e-mail from mukendijp@outlook.com described Mukeune's

medical situation as dire, and supported Kramer's claims that Mukeune was in the hospital and

did not have money to pay his hospital bill.

44. In sum, a person identifying himself as Kramer has used the e-mail accounts

f.kramer80439@gmail.com, jiffydoo@gmail.com, and remark1000@gmail.com ("Subject Email

Accounts") to solicit individuals to invest in a purported investment opportunity to export gold

and diamonds from Africa. Additionally, Kramer used all three of these e-mail accounts to make

statements, or send documents, designed to lend credibility to the investment project. Kramer

used his e-mail accounts to instruct investors to send funds through other investors, or to split

investment funds into multiple small amounts to be sent via Western Union and MoneyGram.

Kramer appears to be using high-pressure tactics in his e-mails as a means of encouraging

investors to continue to send money. Furthermore, Kramer's e-mailed instructions to investors

on the mechanics of how to send the money suggest Kramer's intention to conceal and disguise

the nature, location, source, ownership and/or control of the funds, as well as to avoid transaction

reporting requirements.

## KRAMER'S TRAVEL TO THE NORTHERN DISTRICT OF CALIFORNIA

45. Kramer traveled to the Northern District of California in 2008 and 2010 to meet with an investor at her home.  During these meetings, Kramer explained the project to the investor and solicited the investor for funds for the project.  This same investor traveled to Switzerland in 2013, and spent approximately 11 months there with Kramer working on the project.  During that time this investor took photographs of Kramer and sent them to other investors in the Northern District of California.  A comparison of these photographs with the photograph on Kramer's Swiss passport number, # X2782495, indicates these are the same individual.

46. In September 2015, Kramer exchanged e-mails with an FBI undercover agent, herein identified as UCE-1.  During the e-mail exchange with the FBI undercover agent, Kramer used email account f.kramer80439@gmail.com to email his Swiss passport number X2782495 to UCE-1.  UCE-1 and Kramer spoke over the telephone and discussed Kramer's passport.  The individual identifying himself as Kramer to UCE-1 over the telephone spoke in accented English.

47. In September 2015, while corresponding with UCE-1, Kramer claimed to be in Africa. In June 2016, while corresponding with UCE-1, Kramer claimed to be in Switzerland.  On July 1, 2016, Kramer told UCE-1 he would be flying out of Oslo, Norway on or around July 6, 2016. Checks for Kramer's U.S. and Swiss passports indicated that Kramer has not been in the U.S. since September 2010.

## **SUMMARY OF PROBABLE CAUSE**

48. The following factors, when viewed together, provide probable cause to believe that Kramer's project is a fraud:

        a. Ten of the documents e-mailed by Kramer to investors, which were represented by Kramer as official documents issued in the DRC, were reviewed by a

government official in the DRC, and that official stated that he believes that the documents are fakes.

b.   A Kimberley certificate associated with Kramer's project was reviewed by a U.S. government employee with knowledge of the Kimberley process and certificates.  This U.S. government employee stated that Kramer's Kimberley document appeared to be fake.  Further, Kramer repeatedly misspelled the word Kimberley as "Kimberly" in e-mail correspondence with investors.

c.   During a June 2016 telephone conversation with UCE-1, Kramer claimed he was in charge of the project.  Kramer further stated that he had full authority to enter into contracts on behalf of the project.

d.   In an August 2015 e-mail sent from f.kramer80439@gamil.com to an investor, Kramer wrote, "The last time that I personally saw them, touched them, was a short time back, at beginning of the year," in response to the investors question if Kramer had ever seen the gold and/or diamonds first hand.

e.   On September 26, 2013, Kramer was arrested in Switzerland on suspicion of fraud.  Kramer was subsequently released on October 16, 2013.  The penal inquiry into this matter was suspended on February 13, 2015.

f.   The project was sold to investors as a short-term investment.  However, there is no indication that any investor has received anything in return for an investment since the first investor funds were transmitted per Kramer's instructions in or around December 2008. Further, according to Kramer and Mukeune, a series of unlikely events has prompted requests for additional investments, including such implausible scenarios as a car fire burning up $80,000 in cash and

Mukeune requiring surgeries on both his brain and his liver.  In my experience investigating fraud cases, it is common for the individuals committing the fraud to create scenarios involving purported short-term investments which are then dragged out indefinitely by additional requests for investment funds to prevent the loss of what has previously been invested, while no money is ever actually paid out to investors.

g.  Kramer and Mukeune claim to have control of tens of millions of dollars' worth of gold and diamonds, yet they are seeking out small, individual investors in the United States to finance their purported export project.  In my experience investigating fraud cases, it is common to see perpetrators of a fraudulent scheme targeting individual, small investors who are relatively inexperienced rather than going through traditional funding channels such as a bank, a venture capital firm, or some other more main-stream source of funding.  In addition, the apparent tolerance for years of delay demonstrated by Kramer and Mukeune also is a factor which suggests that the scheme is more likely fraudulent than legitimate.

h.  The perpetrators of the scheme in this case told investors that they could enjoy a return of as much as ten times the amount invested on their investment, for a term as short as one month.  In my experience investigating fraud cases, a rate of return of as high as ten times the amount invested for a short-term investment, particularly for a term as short as one month, is unrealistic and indicative of a fraud scheme.

19

i.   There are other indications that this project did not follow standard business practices which suggest that it is a fraudulent scheme. There is no indication the project has its own bank account. Some of the investment funds have been routed through investor bank accounts and bank accounts in Canada and Tanzania allegedly belonging to the daughter of a mine owner and a transportation company, respectively. Kramer also directed investors to send cash via Western Union and MoneyGram to unknown receivers in Tanzania, South Africa, Zambia and Zimbabwe. Kramer has also instructed investors to send cash to Kramer in Switzerland via Western Union, and in Kenya via MoneyGram.

49.   Based upon the foregoing, my training and experience, and the training and experience of agents and investigators involved in this investigation, I believe that there is probable cause to believe that Fritz Kramer is involved in the commission of wire fraud and commodities fraud in violation of Title 18, United States Code §§ 1343 and 1348. Accordingly, I respectfully request a warrant be issued for his arrest.

//

//

//

//

//

//

//

//

20

## REQUEST FOR SEALING

50. Since this investigation is continuing, disclosure of the warrant for Kramer's arrest, this
    affidavit, and/or this application and the attachments thereto will jeopardize the
    progress of the investigation. Accordingly, I request that the Court issue an order that
    the arrest warrant, this affidavit in support of the arrest warrant, the application for
    arrest warrant, and all attachments thereto be filed under seal until further order of this
    Court

Respectfully submitted,

MARK R. MATULICH
Special Agent
Federal Bureau of Investigation

Sworn to before me this ⌒ day of July 2016

NATHANAEL COUSINS
United States Magistrate Judge

21