Daniel L. Barton, Esq., (SBN: 135806)

**NOLAN
BARTON
OLMOS LLP**

600 University Avenue
Palo Alto | CA | 94301
T 650.326.2980 | F 650.326.9704

Attorney for Defendant
FRITZ KRAMER

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR-16-00322 EJD |
| Plaintiff, | **SENTENCING MEMORANDUM** |
| v. | |
| FRITZ KRAMER, | Date:    October 17, 2019 |
| Defendant. | Time:   1:30 p.m. |
| | Dept:   The Hon. Judge Edward J. Davila |

Defendant Fritz Kramer, by and through his attorney Daniel L. Barton, hereby submits this Sentencing Memorandum for the court's consideration in connection with Mr. Kramer's sentencing. Defendant requests that the court impose a sentence of 47 months in federal prison.

In support of this request, defendant submits argument and authority to support his objections to the Sentencing Guidelines calculations set forth in the Presentence Report. Defendant also provides the court with a detailed history of Mr. Kramer's life, which is included in the argument regarding the factors indicating that a below guidelines sentence is appropriate pursuant to 8 U.S.C. section 3553.

Defendant also submits a statement to the court written by Mr. Kramer personally. In that statement, Mr. Kramer reiterates that his testimony to the jury was truthful, that the goods in question are real, that Mr. Kramer's efforts to export gold and diamonds from the Democratic Republic of Congo

were legitimate and lawful and were not fraudulent, that the Undertaking is not a fraudulent scheme but rather a development project to alleviate poverty in central Africa, that Mr. Kramer and Jean Paul Mukuena fought relentlessly to export the high value minerals, that Robin Crest was a co-manager of the project, that the export endeavor failed largely as a result of attacks on the project by Robin Crest and Greg Kennedy, that the government failed to sufficiently investigate the existence of the gold and diamonds, that such investigation would have shown that the shipments were real, and that Mr. Kramer was not given a fair trial because of the two and half year delay between the arrest and the jury trial which deprived Mr. Kramer of the ability to present witnesses -- especially European, Asian and African witnesses who were beyond the subpoena power of the court -- to testify in his defense.  Finally, Mr. Kramer argues that his conviction is unjust and unwarranted; he seeks the court's intervention prior to sentencing to redress his unjust conviction.  Defendant's personal statement to the court is attached hereto as Exhibit A.

Defendant also submits various letters of support which are attached hereto as Exhibit B. These include letters from Paul Polak, Michael Edesess, Nicole Kramer-Axelrad, Elio Marazzi, and Craig Bishop.

## 1.    INTRODUCTION

Mr. Kramer has reviewed the Presentence Report [hereinafter referred to as "PSR"] and has objections to its content and the imprisonment recommendation of 108 months. Many objections remain unresolved, as noted in the addendum to the PSR on pages 29 through 35.

Mr. Kramer disagrees with the Sentencing Guidelines calculations set forth in the PSR and, for the purposes of this memorandum, highlights the objections which erroneously lead to a total offense level for guideline purposes of 32.  Mr. Kramer also argues that a variance is appropriate pursuant to 8 U.S.C. section 3553.

## 2.    OBJECTIONS TO THE GUIDELINE CALCULATIONS

**Loss Amount (PSR Objection Number Eight)**

The Probation Officer determined that the loss amount under U.S.S.G. §2B1.1(b)(1) was at least $9,500,000 but less than $25,000,000 warranting a 20-level increase. This figure was based on a finding

that over $12,000,000 came from "western investors" including money from African investors per Mr. Kramer's trial testimony. *See PSR* ¶22, 23 & 58. This figure is inflated and inaccurate.

Mr. Kramer testified that this figure included his own money and that of his African counterparts and the other participants and investors in Africa who contributed towards the payment of taxes, fees and other expenses demanded by African governments.  According to the government and the indictment, these African counterparts were not real investors but were accomplices who were instrumental in committing fraud to obtain money from investors:

> A. That's $12.1 million.
> Q. How much of that is money that you brought in based on your representations to investors in Australia, the United States, and other non-African countries?
> A. Well, I, and my close friends, my family, came up with about, the immediate family, about $3 and a half million, $4 million.

**RT 03/13/19 135:17-23**

> Q. We can clarify that, though.
> Does the $12 million include money from African investors or does the $12 million just based on the 20, approximately 20 that we just discussed.
> A. It includes the African money.
> Q. If we take the Africa money out, what is the number? Approximately?
> A: Probably about 9 million.
> Q. So about $9 million from western investors, fair?
> A. Yes.

**RT 03/13/19 148: 14-23**

It was established on direct examination of the defendant that Mr. Kramer's own investment in the project was just over $2 million at $2,170,000. **See RT 03/12/19 pages 17-26**. The government did not argue or produce any evidence that the purported African investors actually invested funds. The $2.17 million from Mr. Kramer and the purported $3 million from the Africans should not be included in the loss amount. Subtracting the $5.17 million from the $12.1 million total provided by Mr. Kramer puts the loss figure at $6.93 million.

The PSR calculates restitution at $9,708,016.53. *See PSR* pg. 25 and 33 ¶114. However, this figure includes a loss amount from Robin Crest of $1,367,647, which is not an amount she even claims to have actually invested, but rather includes $1,000,000 Ms. Crest seeks to award herself for an alleged

assault in Switzerland. The actual loss figure is less than $9,500,000 and the offense level warranted under U.S.S.G. §2B1.1(b)(1) should reflect an increase of 18 and not 20.

Furthermore, the restitution figure includes a claimed loss of 1,666,000 from Rebecca Bender. This loss figure is inconsistent with her statements to investigators prior to trial, her claimed loss stated at Mr. Kramer's detention hearing and her trial testimony. Ms. Bender initially claimed the loss was around $800,000 and later at trial claimed that it was more, reporting her loss to the IRS to be $1,167,000. She has provided no additional documentation to support the increased loss figure reported in the PSR and the only the document the defense has seen documents her losses at $796,950. *See* Exhibit C (provided in discovery but not admitted into evidence at trial). This document, according to Ms. Bender's trial testimony, was kept contemporaneously with her investments.

The figure provided by Greg Kennedy also overstates his actual investment, as hundreds of thousands of his claimed loss did not go to Mr. Kramer but to individuals in Africa who received money not pursuant to directions from Mr. Kramer. On August 14, 2016, Mr. Kennedy provided the government with the documentation to prove his losses. *See* Exhibit D, email and attachment from Greg Kennedy submitted August 14, 2016. Mr. Kennedy entered into agreements with Mr. Kramer for $75,000 ($150k agreement split with Josh Steinbruchel), $150,000, $330,000 and $150,000, totaling $705,000. *See* Exhibit D-pgs. 2-13. Mr. Kennedy also provided $317,000 in cash to Mr. Kramer when he met with him in Singapore. *See* Exhibit D-pg. 14,. In addition, he made payments totaling $103,312 to Mr. Kramer for expenses. *See* Exhibit D-pgs. 15-17. Mr. Kennedy made many payments to other individuals in Africa that he listed for various fees and expenses, including hotel stays for himself in Dubai, which should not be applied to the loss attributable to Mr. Kramer. With the exclusion of these payments/expenses, the losses caused to Mr. Kennedy by Mr. Kramer is more accurately reflected as $1,125,000 and not the $1,850,000 he seeks to claim.

**Substantial Financial Hardship (PSR Objection Number Nine)**

The PSR indicates that at least five victims suffered substantial financial hardship warranting a four-level increase pursuant to USSG §2B1.1(b)(2)(B). Mr. Kramer concedes that the testimony of

Cheryl Spetrino, Rebecca Bender, [1] Herb Goodrich and Jacklyn Larsen establishes substantial financial hardship within the meaning of USSG § 2B1.1. Mr. Kramer objects that there is an insufficient factual basis to conclude that Dennis Wong, Ron and Susan Blackburn and Robin Crest experienced substantial financial hardship within the meaning of the Sentencing Guidelines.

The PSR represents that Ms. Crest was a victim who lost $248,009 of her personal investment. *PSR* ¶27. Mr. Kramer disputes the accuracy of that claim.  Ms. Crest also claims other expenses, including medical expenses for a total loss of $1,376,647.  Ms. Crest did not testify at trial and to date has been unable to provide the government with reliable financial data to calculate her investment, if any. The loss amount attributed to her is based largely on transfers sent by her through Western Union and MoneyGram that were almost entirely funded by others and not funded by her own personal monies. **See RT 03/05/19 29:11-18**. The stated restitution claim also includes $1,000,000 for the claimed assault. Robin Crest, unlike Cheryl Spetrino, Rebecca Bender, Herb Goodrich and Jacklyn Larsen, did not suffer any of the events defined under Comment N. 4 (F) to USSG § 2B1.1.

**Robin Crest Assault (PSR Objection Number Thirteen)**

The PSR included the alleged assault on Robin Crest as a factor for the Court's consideration. *PSR* Pg.8 ¶24.  In the response to defendant's objection, the Probation Officer indicated he is guided by USSG §6A1.3 which  states "in resolving any dispute concerning a factor important to the sentencing determination, the Court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, *provided that the information has sufficient indicia of reliability to support its probable accuracy*".  (*Emphasis added.*) While it is true that the Swiss documents and medical records of Ms. Crest support that she suffered a back injury, there is insufficient indicia to support the conclusion that Mr. Kramer intentionally committed any assault on Ms. Crest. In a letter from the prosecutor's office in Zurich it stated that "there was a scuffle in the course of such a dispute, in which Robin CREST fell to the ground and injured her hip and ankle". *See* Exhibit E, translation of letter

---

[1] While Mr. Kramer does not contest that Rebecca Bender suffered substantial financial hardship, he does contest the amount of loss claimed by Ms. Bender.  The PSR finds that Ms. Bender is entitled to restitution in the amount of $1,666,000.  Ms. Bender did not invest that amount and there has been no showing that she suffered losses in that amount.  At trial, Ms. Bender put her total loss at approximately $1,167,000.  The most credible loss figure would be either her contemporaneous records of her initial claim of approximately $800,000 in losses or her trial testimony.

1   from Swiss prosecutor. Other than the untested testimony of Ms. Crest, there is little to support her

2   accusation and the Court should not consider it as qualifying as relevant conduct for sentencing purposes.

3      Dennis Wong largely invested, without the knowledge of his investors, funds from Strategic

4   Income causing the losses that led to bankruptcy of this business but not to Mr. Wong personally.

5      Ron and Susan Blackburn lost money form their retirement fund but remain financially stable.

6   The statement of the Blackburn's summarized in Paragraph 39 of the PSR does not report any event

7   described as amounting to substantial financial hardship within the meaning of Comment N. 4 (F) to

8   USSG § 2B1.1.

9   **Offense Conducted Outside the United States  (PSR Objection Number Eleven)**

10      The Probation Officer determined that because a significant part of this scheme was committed

11   outside the United States a two-level increase was warranted pursuant to USSG § 2B1.1(b)(10). See PSR

12   ¶60. Mr. Kramer objects. The Sentencing Guidelines do not explicitly address the issue of whether purely

13   foreign crimes and activities may be considered to calculate the base level of an offense.  Conduct that

14   occurred entirely outside the United States, or almost entirely outside the United States, should not result

15   in an increase of the base offense level. See, *United States v. Azeem,* 946 F.2d 13 (1991 2d. Circ.).

16      Furthermore, because the large majority of the charged conduct occurred outside the United

17   States, Mr. Kramer was denied the opportunity to compel the production of relevant documents in the

18   possession of foreign governments and entities.  He was also unable to compel the appearance of

19   witnesses who had the greatest firsthand knowledge of Mr. Kramer's activities in Africa.  Mr. Kramer

20   was also denied the opportunity to conduct Rule 15 depositions in Europe and Africa to obtain admissible

21   statements from witnesses. Holding a trial in the United States to adjudicate conduct that took place

22   almost entirely abroad severely impeded Mr. Kramer's ability to defend himself.  To now increase the

23   guideline calculation based on the offense conduct occurring outside the United States unfairly

24   compounds the prejudice that Mr. Kramer has had to face by the government's prosecuting this offense in

25   a court far removed from the facts at issue.

26   **Obstruction of Justice  (PSR Objection Numbers Four, Five, Six, Seven and Ten)**

27      The Probation Officer determined that a two-level increase was warranted pursuant to USSG §

28   3C1.1 for obstruction of justice, largely adopting the government's argument regarding four categories

where they assert that there is evidence of obstruction of justice on Mr. Kramer's part. In a letter sent to

Probation, the government sought an adjustment for obstruction of justice based on the following:

     a.  Mr. Kramer gave false testimony regarding his income from the undertaking in a

     Norwegian government document;

     b.  Mr. Kramer made false statements blaming the victims;

     c.  Mr. Kramer made false statements regarding false documents he knowingly gave

     investors in three categories: Kimberley for gold, the role of the UN and the role of

     Interpol; and

     d.  Mr. Kramer made false statements regarding his intent to defraud investors.

     Mr. Kramer objects to this enhancement and submits that the allegations are erroneous for all four

categories of allegedly obstructive conduct.

**Income and the Norwegian Government Document (PSR Objection Number Four)**

     The PSR inaccurately concludes that the Norwegian Ungbo Family Report contained intentionally

false statements from Mr. Kramer. It was apparent from the report itself and from Mr. Kramer's

testimony that this report was generated based on a conversation between Mr. Kramer and/or his partner

Ms. Saenz and some unidentified person, interpreted by that person and put to paper. Mr. Kramer

repeatedly testified that he would not have said "current income," of which he had none, but that he

would only have been referring to income he *expected to receive* from the project:

> Q. Thank you. Do you remember the exact words in relation to what
> you said about the income that you had available that you made in the
> Norwegian foster parent application?
> A. Oh, I would have said that the income that would be available to
> me would be social security or a pension that I could draw on, and the
> income would be from projects that should materialize soon.

> **RT (3/14/19) at 77:11-17**

> Q. Do you remember saying, without any reference to future income,
> you currently have income from projects in that application?
> Do you remember that?
> A. No, I didn't. I would never say that.

> **RT (3/14/19) at 78:6-10**

Mr. Kramer further explained why he could not and would not have said the income was current:

> Q. And so when representations were made about income to the
> Norwegian -- about your income to the Norwegian authorities, and you
> said current income, did you have any at that time?
> A. Oh, I didn't say current income. I said the kind of money that will
> come from my side will be -- I will have to now apply for social
> security to get that started, and I was totally convinced that within a
> matter of weeks or days we were quite advanced already on that day
> with several consignments, and, of course, the big one. And so that I
> could get -- I would get part of my money back in the very near future.
> yes, indeed.
> Q. But you didn't actually tell the Norwegian authorities it was future
> money or anything like that, did you?
> A. No. Actually, it was to say what kind of resources will be available
> for the -- with the foster children, and so I will have referred to the
> social security, and I will have referred to the project income that I
> expected.

**RT (3/14/19) at 81:13-25**

Mr. Kramer was being truthful in his testimony that the statements about Mr. Kramer's income refer to his anticipated future income. This testimony was not rebutted. The interview with the unidentified individual working with the Norwegian authorities that generated this report was conducted in December 2015, but the report was not in Mr. Kramer's possession until five months later on May 25, 2016, presumably when it was sent to him by the Norwegian authorities.

Mr. Kramer wholeheartedly believed that by the time he was approved as a foster parent he would have income from his project, which to Mr. Kramer was always imminent. Mr. Kramer's testimony was not false and did not mislead the jury as to any element of the offenses of wire or commodities fraud.

**False Statements Blaming the Victims (PSR Objection Number Five)**

The PSR at ¶15 asserts that in his testimony Mr. Kramer "repeatedly sought to shift responsibility to the victims of his fraud through false and misleading statements about their level of involvement in the scheme, in an effort to evade accountability for his own criminal conduct". The government in their letter to Probation pointed to Mr. Kramer's testimony in relation to Dennis Wong, Barbara Kent and Cheryl Spetrino, Robin Crest, Rebecca Bender, Jacklyn Larsen and the wider investor community to emphasize this blaming of victims.

//

**Dennis Wong**

The government directed the Probation Officer to Exhibit 285 (Exhibit F), in which Mr. Kramer *admitted* to using "white lies." The "white lies," however, were not to a victim. They were not made to induce any person to invest money in the Undertaking. They were made to those in Africa demanding for themselves the money Mr. Kramer received from victims. Mr. Kramer was basically holding off African officials on their demands for payments, which he had to do often throughout course of the Undertaking. The making of false statements to African governments to delay consequences for lack of timely payments does not support a finding of obstruction of justice.

The government asserts that Mr. Kramer is engaging in obstructive conduct in his testimony blaming Dennis Wong for the letter drafted in the government's Exhibit 285 (Exhibit F). Perhaps Dennis Wong did not draft this letter on this specific occasion, but Mr. Kramer was not knowingly false in suggesting that Dennis Wong "might" have been the author, as Mr. Wong had so often been throughout the project. **RT 3/13/18 at 212: 5-10.**

Exhibit G shows that on several occasions Dennis Wong did just as Mr. Kramer testified to and drafted this type of letter holding off the demands of African governments for the payment of large sums of money. Mr. Kramer should not be punished for erroneous testimony that consisted merely of conflating one incident with another.

Mr. Kramer's trial testimony occurred almost nine years after the date of the letter at issue. The testimony regarding Dennis Wong's efforts to hold off the demands from African officials for immediate payment was not an example of deliberately false testimony but one of fading memory and confusion after almost nine years later. Given Mr. Kramer's mental health diagnosis, this court should not hold that Mr. Kramer's erroneous testimony about the details of specific transactions and communications were knowing or deliberate. Mr. Kramer's testimony in this respect was not intended to obstruct justice in any shape or form.

As the Supreme Court noted in *United States v Dunnigan*:

"Of course, not every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury. As we have just observed, an accused may give inaccurate testimony due to confusion, mistake, or faulty memory".

*United States v. Dunnigan,* 507 U.S. 87, 98 (1993)

**Barbara Kent and Cheryl Spetrino**

Barbara Kent did not testify. Cheryl Spetrino could not recall whether Ms. Kent's name and her name were on ownership documents for gold shipments. The government believes Mr. Kramer testified falsely about this issue. A review of Mr. Kramer's testimony confirms that he testified truthfully in this regard:

> A. This is now in the year 2014, and earlier that year we
> found it convenient to take my name -- to change the ownership
> from my name to Barbara Kent's name or Barbara Kent and
> Cheryl Spetrino, and so we made that name change, and that was
> formally completed at our request.
> Q. Did you cease to become the person in control?
> A. No. At the same time there was -- there is an agreement,
> a signed agreement with Barbara Kent and also with
> Cheryl Spetrino that specified that the owner, the true owner
> of the parcel is Fritz Kramer and in the mean time they are
> listed as the owners.

**RT (03/12/19) at 60:3-13**

> Q. Your testimony is that you asked Cheryl Spetrino for her
> permission to put her name down as owner of the big shipment?
> A. Yes, I did.
> Q. And she gave it to you?
> A. She gave it to her friend, Barbara Kent.
> Q. So I want to ask you, did Cheryl Spetrino ever give you
> permission directly to you to put her name down on the big
> shipment?
> A. She gave me permission -- direct permission -- I want to
> be very specific. She agreed to share the responsibility of
> receiving the goods in Switzerland with Barbara Kent so that
> Barbara Kent could provide her with a power of attorney to
> participate in the ownership of the -- and based on that power
> of attorney, we proceeded to put her on the ownership document.

**RT (03/13/19) at 162:6 – 24**

Mr. Kramer's emails show this was not false testimony. *See* Exhibit H. Additionally, the ownership of the shipments themselves changed nothing at all regarding Mr. Kramer's full acceptance of responsibility for the shipments:

> Q. "When I say that I represent true ownership, I mean that
> from an ultimately legal point of view, I am the point person.
> And I am not hiding behind Barbara Kent or any other person
> when it comes to represent the shipment. I assume responsibility."
> A. Correct.
> Q. Is that correct?
> A. Yes.

**RT (03/13/19) at 178:14 – 21**

**<u>Robin Crest</u>**

Ms. Crest sought to benefit from the project largely by earning commission for the participants she brought in and not for money she invested. The PSR concludes that Mr. Kramer in his testimony falsely overstated Ms. Crest's role in the project but points to no evidence to refute Mr. Kramer's characterization of Ms. Crest's activity. Mr. Kramer testified:

> A. I worked with her in person. I worked with her by phone,
> by skype, by e-mail. I worked with her for sometimes 24 hours
> a day in the end. For years I worked with her.
> She put in more time -- can you imagine? -- more time into
> the project that I myself did, and I almost killed myself doing
> it, but she was at it all of the time, seven days a week and
> seven nights a week.

**RT (03/12/19) at 175:10-16**

Mr. Kramer's testimony was accurate. Ms. Crest travelled to Switzerland in 2013 and stayed there for the better part of a year to receive the shipment of the Big One and to help manage and solicit funds to advance the Undertaking. Ms. Crest played a leadership role during this time frame. She was the point person to communicate with Rebecca Bender, Herb Goodrich and other investors whom she brought in. Ms. Crest aggressively pursued investments from many individuals that she knew and many that she did not know.

Ms. Crest did in fact put enormous pressure on Mr. Kramer and was deeply and aggressively involved in the Undertaking, as can be seen from the emails in Exhibit I, a selection of emails not admitted into evidence which demonstrate Ms. Crest's aggressive approach to the Undertaking.

Additionally, the PSR represents that Ms. Crest was a victim who lost $248,009 of her personal investment. *PSR* ¶27. Mr. Kramer disputes the accuracy of that claim. Ms. Crest also claims other expenses, including medical expenses for a total loss of $1,376,647. Mr. Kramer also disputes this contention. Ms. Crest did not testify; and the losses claimed by her are not verified.

**<u>Rebecca Bender, Jacklyn Larsen and the Investor Community</u>**

In its letter to Probation seeking an upward adjustment for obstruction, the government presents Mr. Kramer's testimony entirely out of context. The government seeks to punish Mr. Kramer for testifying. The comments to USSG § 3C1.1 explain that this adjustment is not intended to punish a

---

defendant for exercising a constitutional right: his right to testify. When Mr. Kramer testified as to his contacts with Rebecca Bender and Jacklyn Larsen and the investor community, he was explaining the actions of these individuals and the effect those actions had on his own behavior. He should not be punished for choosing to testify at trial and doing his best to accurately explain what occurred.

> A. No. This is -- that is a very valid question, and I felt
> pressured from the investor community to continue.
> At the same time, I made the investor community my
> community. I assumed responsibility not only for the project
> but also for the monies that had been invested. I could not
> sleep over the fact that I had such great responsibilities on
> my shoulders and so many people were invested.
> At the same time, I had more than a hundred million
> dollars worth of goods available. I had to make it successful,
> and I went to extremes with my own resources. I went then to
> extremes to the investors to see come on, participate, help me
> get it across the finish line.
> So, therefore, it was not pressuring people to give more
> money but to include people in the urgency of the situations
> and to make them participate.
> So if there was any pressure, it was to be successful
> together and I needed their help in order to finish it because
> I, myself, could not do it. Without their help, we would have
> to forget it and lose everything.

**RT (03/14/19) at 63:22–25; 64:1-15**

**False Testimony and Documents**

The PSR concludes that Mr. Kramer knowingly provided false certificates and documents to investors. The testimony at trial showed that the certificates and documents identified as false were sent to Mr. Kramer by individuals in Africa -- primarily Jean Paul Mukuena, Emmanuel Mukutwa, Mario Franco, Chisebu Rodgers and various African shipping and transport companies.  There was no evidence that Mr. Kramer created any false documents or was aware that any documents were false at the time that he sent them to participants.

Mr. Kramer testified to his belief in the documents and the reasons he believed in them. He relied on the information provided by the above-listed individuals and companies in Africa. The government's evidence and assertions that the documents are false does not alter Mr. Kramer's sincere belief in the existence of a Kimberley process for gold or the role of the U.N. and Interpol in regulating gold commerce from Africa.

Mr. Kramer testified truthfully as to his beliefs. He has at all times acted on those beliefs. And while the government may vehemently disagree with the accuracy of these beliefs, the reports by Dr. Chamberlain and Dr. Gregory may explain why Mr. Kramer believed these individuals in Africa, despite evidence that might suggest to most people that he should not. Mr. Kramer testified:

> Q. When you received these documents, did you trust the
> accuracy and authenticity of the documents?
> A. Very much so.

**RT (03/12/19) at 89:1-3**

> Q. Mr. Kramer, did the information that you obtained from the
> U.N. officials and the information that you obtained from
> Emmanuel affect your understanding about the nature of a
> Kimberley for gold requirement?
> A. Yes, it did.
> Q. When you communicated with investors regarding the
> requirement and the need for Kimberley for gold, did you have
> in mind the information that you learned both from Emmanuel and
> from individuals at the U.N. and Nairobi?
> A. That is correct. Emmanuel had communicated back to me
> first it is a lie. Second then coming back and saying there is a requirement
> for gold. And only a few days later, independent of Emmanuel, the same
> information came from Franco. Now, I became -- I thought,
> okay, something is indeed going on and -- yes.

**RT (03/12/19) at 95:16-25 & 96:1-6**

> Q. From your own knowledge, was the U.N. active in dealing
> with high value shipments of gold and diamonds from central
> Africa?
> The court: You're asking his personal knowledge of this?
> Mr. Barton: Yes.
> The court: During his time in Africa?
> Mr. Barton: Yes.
> The court: You can answer that question, sir.
> The witness: The U.N. was quietly extremely active in trying to
> control the leaving of gold and diamonds from the Congo through
> nebulous ways. Even though the U.N. did not have any authority to
> act as a police organization, they could not directly get involved.

**RT (03/12/19) at 171:3-5 & 171:7-17**

> Q. Mr. Kramer, just to confirm, all I'm asking is that you
> recall that Mr. Cook said that there was no such process for

the certification of gold exports. Do you recall him saying that?
A. I recall that.
Q. And then I think you expressed your opinion on that so
please feel free. What was your opinion?
A. I have personal experience, direct experience in that the
U.N. in the year 2010, and possibly in '11, also the U.N.
office in Nairobi issued letters, what they formally are called
U.N. certificates on specific gold shipments that could be
shown that they were, quote, "clean ones," where the mine would
make a request to Nairobi and Nairobi would undertake to get to
view those materials involved and then issue a, what was indeed
referred to as the U.N. certificate, and I have experience with
it because I was in the U.N. offices at that time, and I know
that Franco in one of his shipments he went or came to Nairobi
and he could obtain a U.N. certificate for that particular
shipment. So on the basis of that I say it's my experience that I
observed it.
I also encountered one or two situations where customs in
different countries had asked for the presence of the
U.N. certificate. It was for a limited amount of time, and I
saw one and had seen reference to it by customs, by others, but
that's all my experience.
And whether Mr. Cook, if he says so, he's an expert, and
he has good information.
But at the same time, I have my information, and I can
only rely on my information. And it was the first time that I heard
it from him that such a document never existed.

**RT (03/13/19) at 219:15-25 & 220:1-20**

The PSR indicates that Mr. Kramer testified to the veracity of a Kimberley certificate process for gold. That is true. Mr. Kramer has consistently believed that there was a Kimberley process for gold. He testified that the Kimberley process for gold was administered by the Office of the President of the Democratic Republic of Congo, and Mr. Kramer identified stamps on his Kimberley certificates for gold as the stamps of the Office of the President of the Democratic Republic of Congo. Mr. Kramer testified that the Ministry of Mines of the DRC was also involved with administering the Kimberley process for gold. This testimony was in contradiction to the testimony of prosecution expert Rupert Cook.

If Mr. Kramer is wrong about his belief in the existence of a Kimberley process for gold, that error should not be held against him at sentencing. A defendant should not be punished for exercising his constitutional right to testify; nor should he be punished for harboring erroneous beliefs about the procedures of the Congolese government for attempting to control the traffic in conflict gold. Mr.

Kramer's beliefs about the Kimberley for gold process in the DRC were sincere, and Mr. Kramer acted and relied upon those beliefs.

In evaluating the significance of any inaccurate aspects of Mr. Kramer's testimony, it is important to note that Dr. John Chamberlain opined that Mr. Kramer has a preoccupation with apparently delusional material and that Mr. Kramer's decision-making about the case is governed by delusional beliefs. Similarly, Dr. Amanda Gregory stated that "If Mr. Kramer persists with his belief in the project and remains rigid in his approach to the case, and refuses to consider other options or strategies, his competency would be highly questionable due to delusions." (Dr. Amanda Gregory Report, August 10, 2017, p. 23.) Dr. Gregory also concluded that Mr. Kramer suffers from "Behavioral Disturbance [which] includes agitation under high stress levels and possible delusional thinking." (Dr. Amanda Gregory Report, August 10, 2017, pp. 25-26.)

In assessing the significance of Mr. Kramer's beliefs that are at odds with those of the prosecutors and the government expert, it is important to consider the mental health diagnoses rendered by both Dr. Chamberlain and Dr. Gregory.

The PSR states that Mr. Kramer knew that the United Nations had never been involved in the gold and diamond export process at the time of his trial testimony. There is no basis for this conclusion. Mr. Kramer has at all times believed that the United Nations plays an active role in overseeing gold exportation from Central Africa. That belief is not shared by prosecution expert Rupert Cook. Mr. Kramer, however, should not be punished for exercising his right to testify and for honestly responding to questions about his understanding, or misunderstanding, of the role of the United Nations in regulating or not regulating international commerce in gold and diamonds.

The PSR states that Mr. Kramer knowingly falsely testified that Interpol played a role in administering and overseeing gold and diamond exports from Africa. Again, Mr. Kramer's beliefs were not shared by prosecution expert Rupert Cook. Mr. Kramer, however, believes that Interpol plays a significant role in administering and overseeing gold and diamond exports. Mr. Kramer should not be punished for truthfully answering questions regarding his understanding, or misunderstanding of the role of Interpol, even if his belief is not consistent with the opinions of the prosecutors and the testimony of the government expert -- or even if his beliefs are conclusively shown to be wrong.

**False Statements Regarding Intent to Defraud (PSR Objection Number Ten)**

The PSR concludes that Mr. Kramer provided false statements regarding his intent to defraud his investors and that Mr. Kramer attempted to persuade the jury that he should not be held accountable for the scheme by falsely denying that he intended to defraud his victims. *PSR* Pg.13 ¶49.

Mr. Kramer believes that he owns gold and diamonds in Africa. He experienced firsthand the various setbacks that occurred in the over-nine-year-long process of attempting to export and monetize the gold and diamonds. Mr. Kramer attempted to communicate with the investors accurately regarding all of the various setbacks that he encountered in his efforts to export and monetize the gold and diamonds. Mr. Kramer's testimony that he did not mislead investors accurately reflects his own state of mind and his perception of events.

Similarly, as noted above, Mr. Kramer never intended to send out false documents. The evidence presented at trial consistently showed that the documents that were sent to investors were received by Mr. Kramer from individuals in Africa in whom Mr. Kramer had confidence, perhaps undue confidence. The senders were identified by name: Jean Paul Mukuena, Emmanuel Mukutwa, Mario Franco, Chisebu Rodgers and various African transport and shipping companies. Mr. Kramer also received documents directly from several government agencies and from lawyers he hired in the DRC, Zambia, Tanzania and South Africa. Mr. Kramer communicated frequently with these individuals and directed large amounts of money to various entities pursuant to the instructions from these individuals. There is no reason to conclude that Mr. Kramer believed his documentation was not genuine or that he ever intentionally sent out fake documents.

**Acceptance of Responsibility (PSR Objection Number 12)**

Mr. Kramer has demonstrated acceptance of responsibility for all of his conduct and the consequences of the conduct. He has thoroughly and truthfully admitted what he did. In his written statement to probation he stated: "I accept full and total responsibility for the undertaking and all my actions related to it." This is something he repeated throughout his testimony at trial and continues to do so.

The commentary to USSG § 3E1.1, comment 2, indicates that a conviction by trial does not automatically preclude a defendant from consideration for an acceptance of responsibility reduction. A

defendant who accepts responsibility but exercises his right to trial may be entitled to an acceptance of responsibility reduction based on his pretrial statements and conduct.

In his statement following his arrest, his statements to the doctors evaluating his competency, and his testimony at trial, Mr. Kramer consistently took full responsibility for the Undertaking. He acknowledged that he was the founder and leader of the Undertaking and he assumed all responsibility for the actions taken by him and by his associates, including Jean Paul Mukuena and Robin Crest. A two-level reduction for acceptance of responsibility is warranted.

**3.     GUIDELINE CALCULATIONS**

Based on the above objections the offense level computation would be computed as follows:

a.   Base Offense Level: (U.S.S.G. §2B1.1(a)(1))                    7

b.   Specific offense Characteristics: (U.S.S.G. §2B1.1(b)(1)(J)     +18

Loss amount less than $9,500,000

c.   Acceptance of Responsibility: U.S.S.G. §3E1.1(b)              -2

d.   Adjusted Offense Level:                                       23

e.   Total Offense Level:                                         46-57 months

**4.     A SENTENCE NO MORE THAN 47 MONTHS IS APPROPRIATE UNDER FACTORS IN 18 U.S.C. § 3553(a).**

The factors in 18 U.S.C. section 3553(a) favor a sentence of no more than 47 months. As the Supreme Court made clear in *Gall v. United States*, while the Guidelines are the starting point in determining an appropriate sentence, the judge should consider all relevant section 3553(a) factors. *Gall, supra,* 169 L.Ed.2d 445, 457; 128 S.Ct. 586, 596 (2007). "In doing so, [the district judge] may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." *Ibid.* [internal citations omitted]. The court's mandate is to "impose a sentence sufficient, but not greater than necessary, to comply with" the basic aim of sentencing. 18. U.S.C. § 3553(a). In Mr. Kramer's case, a prison sentence of 47 months of would squarely fulfill those aims.

**A.     The Nature and Circumstances of the Offense, 18 U.S.C. § 3553(a)(1).**

One factor to be considered under section 3553(a) in determining an appropriate sentence is the

nature and circumstances of the offense. As the Court is aware, this is a highly unusual fraud case wherein the prosecution could not present any concrete evidence that Mr. Kramer committed the offenses intending to use the funds received for his own personal gain. To the contrary, Mr. Kramer commenced his involvement in the Undertaking with a home and substantial savings and retirement accounts.  He soon invested every penny he ever owned and was a pauper for many years before he was arrested.

The evidence presented demonstrated that those who gained from the Undertaking were those in Africa. No one from this hemisphere profited as a result of Mr. Kramer's activities.

Mr. Kramer did not secrete funds in his bank accounts, make extravagant purchases or lead a lavish lifestyle. To the contrary, having expended over $2 million of his own personal funds and his family's in the venture, he lived an extremely frugal lifestyle repeatedly struggling to make ends meet to the extent that he could not pay for his own lodging and food or tend to his most basic needs. In one email to investor Cheryl Spetrino he states, "I am here with essentially no money for transportation and food etc. which is ok since I can live with the breakfast that is included in the room rate". *See* Exhibit J, email dated October 17, 2014, from Fritz Kramer to Cheryl Spetrino.

While not using victim monies for his own personal gain does not cancel out his crime, it highlights a mitigating aspect of the offense. Mr. Kramer's single-minded focus was always on securing funds for the gold and diamonds and not for himself or his own enrichment.

Unlike the typical defendant in a fraud case who presents a false venture to his victims and then secures the funds and expends them on himself, Mr. Kramer gave everything he received to the Africans who he believed were in control of the gold and diamonds that Mr. Kramer believed he owned. This is an exceptional case in which the convicted defendant reaped no personal benefit. This factor must be considered when determining an appropriate sentence.

And while many of the individual victims will be categorized by the government as particularly vulnerable due to their age and having suffered serious financial, emotional and psychological harm, Mr. Kramer himself is no exception to that categorization. Mr. Kramer is a 72-year-old man who just like the victims suffered serious financial loss in pursuit of the project wiping out his entire life savings and that of his family. Mr. Kramer's wife of 43 years ended their marriage and Mr. Kramer lost the close contact he once had with his children, his only sibling and many of his life-long friends. Mr. Kramer's fine

reputation and impressive career of helping the impoverished is forever ruined and his 40+ years of service to them forgotten and overshadowed by this offense.

The evidence at trial did not establish that this endeavor commenced as an investment project. Mr. Kramer put in his own money and that of his brother, cousins and other family and friends.  Even if the approach to the Undertaking changed after the failed efforts to export the initial gold shipment from Tanzania and the discovery of the diamonds, it does not appear that this Undertaking commenced as a fraudulent scheme.  The purported discovery of the diamonds created a dynamic that Mr. Kramer never sought out or anticipated.

It is also clear from Mr. Kramer's testimony during the trial that this grueling project has had a significant effect on his emotional and psychological well-being to this very day. Mr. Kramer was continuously under enormous pressure from those in Africa and from the investors to obtain funding for the project, with Robin Crest pushing Mr. Kramer in one email "This is where your Swiss connections need to step up, Fritz. Offer them whatever you have to get them to jump in NOW. Don't ride this thing down to crash and burn. Your brother, Elio, your girl friend, your kids…..its time to hit them all". *See* Exhibit K, email from Robin Crest to Fritz Kramer.  As this pressure increased and multiplied daily, Mr. Kramer clearly exercised not just poor judgment but made crazy and desperate offers of return to the victims, albeit offers he believed he could make, to make the export project work.

Mr. Kramer remains adamant that he owns the gold and diamonds that he was attempting to export.  At all times, he has acted consistent with the gold and diamonds existing.  The government has never proved that the gold and diamonds do not exist.

**B.       The History and Characteristics of the Defendant, 18 U.S.C. § 3553(a)(1).**

The charged conduct relates to the period from 2008 to 2016.  Before that time, Mr. Kramer lived an honest and industrious life, working on the front line of the "Green Revolution" to combat world hunger and alleviate poverty in the most impoverished regions of the globe.  By all accounts, Mr. Kramer was highly accomplished and extremely devoted to that work. Mr. Kramer was a family man who worked hard to support himself, his wife and his children, both at CIAT and later as a farmer and operator of a small farm-product export business and at IDE. The offense conduct was and remains a surprise to everyone who knew Mr. Kramer before this endeavor; the behavior described at trial is simply

not like the man they knew and loved.

Mr. Kramer is not the same man he was and will never be. Mr. Kramer suffers from a major neurological disorder, which has impaired his ability to critically examine the motives and representations of the people he depended on Africa and, in counsel's and Dr. Chamberlain's opinion, continues to impair his ability to critically evaluate the facts of this case.

Despite the serious mental illness, Mr. Kramer nonetheless takes full responsibility for his actions causing loss to the victims and ponders what the outcome would have been if he had simply given up on the project when the first batch of diamonds had been found in his gold, before the victims provided funds. In hindsight, I am sure that he wishes that he had given up, but this type of hindsight is not something a person like Mr. Kramer, with his disorder, can readily grasp.

Mr. Kramer has acknowledged that he started, operated and directed the gold and diamond Undertaking. He provided a detailed account of his involvement to the FBI agents on the night of his arrest and repeatedly encouraged them to verify the existence of his goods in Africa. The full recording of the lengthy interview with FBI agents following his arrest late on the night of July 6, 2016 was never played for the jury or the Court. In it Mr. Kramer was just as unwavering in his belief in the gold and diamonds as he was at trial and as he continues to be to this day. There is no moving Mr. Kramer from this belief and any attempts to do so are futile to this day.

**Social History of Defendant Fritz Kramer**

**Childhood**

Fritz Kramer was born on April 23, 1948 to Arnold and Berta Kramer in Strengelbach, a small city in northern Switzerland. Its few thousand residents spoke predominately German or Italian. Arnold Kramer owned a vegetable and flower business and Berta worked part time as a seamstress. Rolf Kramer, Mr. Kramer's older brother by two years, looked after Fritz from an early age. The Kramer parents fostered a safe, nurturing household dynamic. Arnold was a conservative, traditional man; he instilled in his sons a deference to authority and passion for learning. Mr. Kramer always proved to be a precocious, quick-witted child. He performed well in primary and secondary school, was socially active, and participated on various sports teams.

When Mr. Kramer was thirteen, his father suddenly passed away. During a routine hernia operation, he suffered from a serious blood clot that ultimately resulted in his death. Arnold's death changed the life of the Kramer family dramatically. The family's predominant source of income and stability disappeared. Berta was forced to take up multiple positions to keep the family afloat.

Still, Mr. Kramer persevered. He maintained exemplary grades and was eventually accepted to vocational school in business, beginning at the age of sixteen. Kaufmännische Berufsschule, the Swiss university where Mr. Kramer obtained his degree, allowed for flexibility within one's coursework. Mr. Kramer focused on business related to construction, but also completed significant coursework in journalism.

**International Travels**

During business school, Mr. Kramer developed a life-long desire to travel, experience new cultures and glean insights from people internationally. He frequently felt isolated in Switzerland. Whenever he was able, Mr. Kramer travelled outside of the country, usually hitchhiking and planning his journey as he went. Throughout his three years in business school, Mr. Kramer visited several countries in North Africa, like Algeria and Morocco, in addition to France, Spain, England and the Nordic countries.

Above all, Mr. Kramer made it a priority to interact with people in the countries in which he travelled. He inquired about their life, their plights and their experiences, and found that one-on-one conversations with residents was the best method to truly get the sense of a new city. He challenged himself to master several languages. In each country he traveled, Mr. Kramer studied its history of war, religion and culture. Mr. Kramer was exposed to the diversity of problems and of opportunities in the world -- a reality that would ultimately shape his career interests and business pursuits.

Mr. Kramer also travelled a great deal within Switzerland itself. In order to earn an income to support his travels, Mr. Kramer worked the service cart on the weekend train, which shuttled between ends of the country.

**Military Training**

Mr. Kramer graduated from business school second in his class of 600 students. Following graduation, he enrolled in the Swiss Military School, as was required of every young man in the country.

The training lasted five months. Mr. Kramer was identified as a potential future officer early into his training and swiftly placed in a streamlined program to prepare selected students to eventually hold leadership positions.

Even while in military school, Mr. Kramer still wished to develop his journalistic skills. He approached a local newspaper and asked if it would publish a daily journal about the ins and outs of military training. The editorial board agreed, and Mr. Kramer began to author daily posts about his experience. He covered topics like endurance exercise training, friendships within the military and the adventures of his company, which operated exclusively in the mountain ranges of Switzerland. Mountain training required extreme driving in Willys army jeeps; Mr. Kramer learned to downshift the gears seamlessly to strike the exact balance while traversing steep mountain terrains. Mr. Kramer had become enamored with the communications information field by observing the technology employed by the military.

**Education History**

Nearing the conclusion of his training, Mr. Kramer felt particularly invested in international journalism. He considered storytelling one of the most meaningful ways to make a global impact. Mr. Kramer had already learned French, Italian and German, but recognized that he should learn English if he were to meet his full potential in his international journalism career. He applied to intensive language programs in the United States, predominately at community colleges. Michigan State University had a prestigious journalism program in which Mr. Kramer intended to enroll once his English was proficient. He elected to learn English at Kellogg Community College, an institution nearby MSU. It was here that he met, Craig Bishop, his lifelong friend.  Mr. Kramer arrived in Michigan in 1967. After a year at KCC and having attained a sufficient grasp of conversational English, Mr. Kramer transferred to MSU's Communication Program in 1968.

Throughout his four and a half years in Michigan, Mr. Kramer had the pleasure of living with and working for several families. For instance, in the summers, Mr. Kramer cared for an elderly veteran of WWII, Bob Reeme. Bob, previously a carpenter, gardener and mechanic, taught Mr. Kramer his trades and shared countless wartime memories. Mr. Kramer felt that he had encountered the quintessential American mindset in Mr. Reeme, whose value system was grounded in determination, loyalty and self-

sufficiency. While in Michigan, Mr. Kramer lived with two sets of retired couples for a year each. He owes his relatively quick grasp of English to his time among these couples, who imparted wisdom and kindness upon him.

Mr. Kramer continued to support himself through school. His family, particularly his uncle, Alfred, disapproved of his departure from Switzerland and Mr. Kramer was left with no one to depend on but himself. He worked odd jobs and frequently made arrangements to work for families in exchange for housing.

Michigan State's academic demands were not especially challenging for Mr. Kramer. Rather, he felt intellectually unstimulated by class material and sought to transfer. In the summer of 1970, Mr. Kramer moved from Michigan to Arizona, where he continued his education at Arizona State University. There he met his future wife, Erlinda, who was his roommate's sister.  After a period of close friendship, the two began dating. Mr. Kramer was drawn to Erlinda's lively, steady personality. While he pursued his degree in communications, Erlinda worked toward earning her teaching credentials. Mr. Kramer graduated with high distinction from ASU in 1971. Shortly after, he and Erlinda moved back to Michigan so that he could obtain his Master's in Communication from MSU. They married there in 1972.

Mr. Kramer's graduate studies were far more theoretical. He was fascinated by theories which explained how new ideas are spread through society, and the rate at which information reaches different populations. In particular, Mr. Kramer studied the works of Everett Rogers, a professor of Communications and Journalism, who formulated the "diffusion of innovations" theory. The theory is interdisciplinary, incorporating elements of psychology, sociology and communications to account for the process by which innovation is communicated through a social system. It was through this theory that Mr. Kramer pivoted away from journalism and, instead, toward information technology and dissemination.

**Employment History**

Mr. Kramer finished his thesis and officially obtained his degree in 1974, and shortly thereafter he and Erlinda moved to Tehran, the capital of Iran. Mr. Kramer was put to work establishing an Iranian task force to incorporate modern satellite technologies into a plan for rural education. Over the course of two years, Mr. Kramer assembled a highly qualified team of 25 individuals to meet this goal. He

travelled extensively within Iran to become well-versed in its history, politics and way of life. In doing so, he learned conversational Farsi.

1976 marked a pivotal moment in Mr. Kramer's personal and professional life. First, his child, Nicole, was born early that year. Second, the developing world was starting to integrate new technological initiatives as a result of the Green Revolution: the deployment of technologies and processes to increase worldwide agricultural production in the late 1960s. These technologies included chemical fertilizers, pesticides, controlled irrigation and new methods of cultivation, particularly in Central and South America.

Mr. Kramer, whose employment in Tehran was concluding, sought to involve himself in the global agricultural sector. In his view, the agricultural practices of the Green Revolution would provide developing countries with the tools to achieve economic self-sufficiency. These innovative technologies were designed to produce a markedly higher yield of crops, allowing producers to sell significantly more produce while expending a fraction of the energy. Mr. Kramer was fascinated by the concept and confident in its future applicability.

**Tenure at CIAT**

Mr. Kramer interviewed for a position through the Consultative Group for International Agricultural Research (CGIAR), a global partnership founded in 1971 to unite organizations in the agricultural sector. Its mission was to reduce rural poverty, increase global food security, and incorporate sustainable management of natural resources. One of its partner research centers was the Centro Internacional de Agricultura Trópical (CIAT) located in Cali, Colombia. He was offered a position as a Communication Scientist, tasked to lead the transition toward more effective and sustainable agricultural practices within CIAT's international operation. He began his career there in 1976 and would remain an integral figure within the research center until his eventual departure in 1997.

Mr. Kramer and his team focused their energy on the tropic regions of South America which yielded crops of dry beans, rice, and cassava, the world's third-largest source of food carbohydrates. These crops provided the foundation of the South American diet. CIAT embarked on national agricultural research projects, engaging with laborers at the local level to understand their cultivation methods. Mr. Kramer's work consisted largely of recruiting outside materials researchers and training them to

transition rural areas toward CIAT-endorsed growth and cultivation procedures. Mr. Kramer ultimately recruited over 500 scientists and professionals internationally.

Their product ultimately consisted of a "packet" of materials intended to yield significantly higher growth within two to three years of implementation. The packet consisted of written and audio materials, coupled with a CIAT employee who oversaw its application. CIAT produced roughly 300 packets to address unique agricultural concerns. The packets were modeled after similar CGIAR operations in Asia and Africa, where biodiversity is the greatest.

The work was immensely gratifying. Mr. Kramer was able to combine his passions and strengths in a complex, effective fashion. CIAT harnessed the combination of science, technology and communication to alleviate poverty and hunger in some of the world's most impoverished areas and to accomplish food production yields up to as much as three times past production.

Mr. Kramer cycled through several leadership positions throughout his tenure at CIAT. He was first promoted to Head of Training Operations in South America. He was required to travel extensively throughout countries in South America to establish national programs and coordinate training to implement them. Their clients were predominately local farmers. Later, in the early 1980s, Mr. Kramer served as Head of Communications, the department which oversaw both training and communications efforts. On the communications end, CIAT published roughly a dozen books annually tracking its progress and making projections about future impact. As Director of Outreach, Mr. Kramer collaborated with other directors and leaders to maintain contacts within the international scientific community. His position also required that he establish relationships with potential donors and government representatives of the countries in which CIAT operated. Mr. Kramer was totally immersed in his career; he spent at a minimum one third of his time travelling throughout the developing world.

**Family Life and Departure from CIAT**

Despite Mr. Kramer's demanding schedule, he and his family led a happy, lively life. Erlinda taught art at an American school and gave birth to two other children: Michelle and Philip, in 1978 and 1984, respectively. At first, Cali proved to be a delightful city. The Kramer family spoke Spanish fluently and established an extensive network of Colombian friends. Additionally, there were communities of American ex-patriots and Swiss travelers, both of which Mr. Kramer socialized with. Mr. Kramer's

income provided a comfortable, yet adventurous, lifestyle; the family enjoyed financial security but also the liberty to travel and experience the world. They lived in a building on the outskirts of the city center among other professionals employed by CIAT.

Mr. Kramer continued to steadily climb the CIAT ranks. After his promotion to Director of International Cooperation in 1983, Mr. Kramer began to contribute to company-wide decisions about budget and global strategy. He also served as the Secretary to the Board of Trustees, a coveted position which placed him in close contact with John Nickel, CIAT's Director General. He accompanied Mr. Nickel to Director's meetings and advised him on various affairs. Mr. Nickel swiftly came to depend on Mr. Kramer and asked him to serve as Deputy Director General, a role which Mr. Kramer occupied from 1985 to 1990. In 1986, after a year and a half of night school, Mr. Kramer obtained a Master of Science degree in Information Technology from Universidad Icesi, a private, vocational university in Cali.

As Deputy Director General, Mr. Kramer was tasked to lead the development of the organization's strategic plan. As CIAT approached a new decade, it was necessary to establish how it would address the anticipated global agricultural issues of the 1990s. Mr. Kramer singlehandedly led the project. His strategic plans revolved around two central tenets: resource management sustainability and continued collaboration with rural populations to influence poverty alleviation. The proposal was ultimately vetted through CIAT, the donor community, the Board of Trustees and the World Bank before being successfully published.

In 1990, John Nickel left CIAT and was replaced by an interim director, Gustavo Nores, who held the position for three years. Though Mr. Kramer respected Mr. Nores' leadership, he was less enthused by the individual who succeeded Mr. Nores. This man did not speak Spanish, had no experience in agricultural development, and possessed a passive leadership style. Mr. Kramer's relationship with the new Director was compromised by their competing visions for the organization's future and their discrepancy in practical knowledge; Mr. Kramer believed that the Director was neither familiar with the agricultural industry nor aware of CIAT's influence within it.

Mr. Kramer ultimately parted ways with CIAT in 1997 after over twenty years of successful employment. He felt that there was no longer upward mobility with the organization. Mr. Kramer left CIAT as an expert of agriculture and crop cultivation in the tropical developing world. He'd come to

understand that a region's agricultural potential depended upon numerous factors, among them water

availability, market conditions, governmental infrastructure and religious and cultural phenomena.

**Independent Farming Operation**

Mr. Kramer decided that he would utilize his experiential knowledge and attempt to cultivate

farmland himself. He owned a plot of land located an hour outside of Cali that he had purchased in 1978.

By 1988, an intrusive beetle had settled on the land, rendering it in need of significant repair. In 1997,

Mr. Kramer fully invested himself in the project and carefully eradicated all traces of the beetle.

Additionally, Mr. Kramer installed electricity on the farm so that it could operate as an independent

processing plant.

Mr. Kramer began growing guanabana, a South American citrus, and producing pulp for juice. He

introduced the juice as a product in local market, which was received exceptionally well. He expanded

his production to other fruits like mango and eventually hired an exporter to distribute the juice outside of

Colombia. Eventually, Mr. Kramer circulated his product within Canada, the U.K., Holland, and other

European countries.

**Employment with IDE**

After running this operation for three years, Mr. Kramer took up a fulltime position as the Chief

Operating Officer of International Development Enterprises (IDE), a nonprofit that used a market-based

approach to increase the income, health and quality of life of millions of people in the poorest regions of

the globe. Mr. Kramer was brought on board by Michael Edesess and Dr. Paul Polak to oversee the

expansion of the company's operation to various locations in Central America, Asia and Africa. The

position brought Mr. Kramer and his family back to the United States, this time to Denver, Colorado.

Between 2000 and 2009, Mr. Kramer and his team developed extensive networks of low-cost,

small-scale water pump and irrigation systems to empower local growers, improve health and sanitation,

and increase food production. Mr. Kramer's main priorities in doing so were, first, to improve the

viability of the seed and, second, to streamline rural access to water. Irrigation systems were built

according to the unique needs and landscape of a given region. For instance, IDE installed variations of a

treadle pump, a human-power suction pump that lifts water from several meters in depth, in rural

Bangladesh, where water is scarce in hilltop regions. Within the near decade of Mr. Kramer's

employment at IDE, the company became world-renowned for its innovative, low-cost technologies that had a life-changing effect in countless impoverished and marginal communities throughout the tropical and sub-tropical world.

**Introduction to Gold Mining**

By 2008, Mr. Kramer began to think critically about the next step in his career. He felt that he'd made his desired impact at IDE and craved change. For the entirety of his career, Mr. Kramer had been both dismayed and fascinated by the disparities in wealth and opportunity in the world. He'd made it his lifelong mission to conceptualize innovative strategies to alleviate poverty and empower people in poor, remote rural communities. Mr. Kramer decided he would expand the same theories that had guided his work in Central and South America to countries in central Africa, namely the Democratic Republic of Congo. The rampant poverty in these regions perplexed Mr. Kramer, given the abundance of natural resources and high-value minerals native to the central African soils.

Mr. Kramer came to the conclusion that to lift rural communities in Africa out of poverty, the solution had to focus on humane, sustainable mining. He visualized the workings of a project which would place more power in the hands of the laborer, as opposed to that of the exporter. Mr. Kramer came to trust and rely on three Africans familiar with the mining and export sectors: Eric Talemwa, a shipping expert from Tanzania; Mario Franco, whom Mr. Kramer had met while working with IDE; and later Jean Paul Mukuena, a Congolese businessman who became Mr. Kramer's most trusted confidant. With the help of Eric Talemwa, Mr. Kramer made his first purchase of 288 kilos of gold and sought to export the gold from the Democratic Republic of Congo to Switzerland via Tanzania.

Mr. Kramer's venture into the world of gold mining and export and the discovery of a large cache of diamonds in his gold would serve to destroy his entire life, undermine the stability of his family and financially harm the people who supported Mr. Kramer in his Undertaking. From 2008 and continuing until after his arrest in 2016, Mr. Kramer vehemently, indeed obsessively, pursued the project. Mr. Kramer lived for his project and little else. He did not lead the high life during these years but endured many hardships with perhaps the worse occurring upon his incarceration in the United States.

Within a couple of months of his arrest, Mr. Kramer reported suffering "the most excruciating back pains imaginable" which left him unable to walk and resulted in him "crawling to the bathroom and

writhing on the floor."  Staff at the Santa Clara County Jail refused to take Mr. Kramer's medical concerns seriously and commented that he should "stop faking it." Despite a significant weight loss and dangerously low blood pressure, Mr. Kramer was given aspirin for pain relief and topical hydrocortisone for his back. After two months of repeated reports of being in excruciating pain and receiving utterly substandard medical care, Mr. Kramer contacted the Swiss Consulate for assistance.

The Santa Clara County Jail's refusal to address Mr. Kramer's medical needs almost resulted in the loss of Mr. Kramer's life. On October 31, 2016, an MRI scan confirmed severe disc narrowing and osteolysis (destruction of bone tissue) possibly indicating discitis (inflammation between the intervertebral discs of the spine). Inflammation markers were also rising in his lab results. Mr. Kramer was sent to the emergency department. On November 5, 2016, it was found that Mr. Kramer also had a bacterial mass around the valve of his heart requiring open heart surgery on November 15, 2016. This intervention saved Mr. Kramer's life and the excruciating pain he had suffered for months finally ceased.

**C.  Deterrence Value of the Sentence and Protection of the Public from Future Crimes of the Defendant, 18 U.S.C. § 3553(a)(2)(B) and (C).**

Mr. Kramer has no criminal record.  Mr. Kramer, if he lives to see his release from prison, is unlikely to pose a future threat to the community.  He has no criminal history and no propensity for violence or substance abuse.

**D.  The Need to Provide Restitution, 18 U.S.C. § 3553(a)(7).**

Mr. Kramer lost his entire life savings in the diamond and gold Undertaking.  He lived an impoverished life as he attempted to secure the export of his goods.  He is 72 years old and is in declining health, especially mental health.  He lacks the ability to pay restitution and will likely never have the ability to pay his investors back, regardless of the sentence imposed.

**CONCLUSION**

The verdicts of guilty are not at all representative of the history and character of Fritz Kramer. Mr. Kramer's Undertaking was not motivated by a desire to accumulate personal wealth, and none of the millions of dollars lost in the endeavor enriched Mr. Kramer personally. For his entire adult life, Mr. Kramer dedicated himself to improving the conditions of the poorest people in the world, and within the field of agricultural development, Mr. Kramer was widely recognized for his work.

1    This court should impose a sentence that is sufficient, but not greater than necessary, to comply

2    with the basic aim of sentencing.  Given Mr. Kramer's long history of positive contributions to the

3    community, his age, his failing mental health and the circumstances of the offense, which did not

4    personally enrich Mr. Kramer, defendant requests that the court impose a sentence of 47 months.

5    Date:   October 3, 2019                              Respectfully submitted,

6                                                         NOLAN BARTON & OLMOS, LLP

7

8                                                         _____*/s/ Daniel L. Barton*_____
                                                         Daniel L. Barton
9                                                         Attorney for Defendant, Fritz Kramer